IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TEXARKANA DIVISION

| | | |
|---|---|---|
| CALVIN AMOS | § | |
| v. | § | CIVIL ACTION NO. 5:17cv195 |
| DENISE JEFFERSON, ET AL. | § | |

<u>MEMORANDUM OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND ORDER OF DISMISSAL</u>

The Plaintiff Calvin Amos, a former inmate of the Bowie County Correctional Center proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in accordance with 28 U.S.C. 636(c). The named Defendants are: Lt. Denise Jefferson; Warden Bob Page; Captain Sherdona Walker; and Nurses Jermetras Willis, Charlotte Storey, and Michelle Arnold.

Defendant filed a motion for summary judgment (docket no. 37) on August 17, 2018. After review of this motion, the pleadings, and the summary judgment evidence, the Court finds that the motion for summary judgment should be granted.

**I. The Plaintiff's Complaint**

A. Lt. Jefferson

In his complaint, Plaintiff states on July 8, 2017, Lt. Jefferson used excessive force by spraying him, on two different occasions, with a large burst of chemical agents a few minutes apart. He states he was sprayed in the eyes, nose, mouth, right ear, head, neck, and on his shoulder. According to Plaintiff, Lt. Jefferson then encouraged the nurses not to provide him with any medical attention, saying Plaintiff could use the water in his cell to decontaminate.

Plaintiff asserts as a result of this incident, Lt. Jefferson was demoted from the rank of lieutenant down to corporal and transferred from the Bowie County Correctional Center to the Bi-State Justice Center. He states Lt. Jefferson bullied him and used the chemical agents outside of protocol and has shown deliberate indifference to him on several other occasions as well. He argues he was "in total compliance and within orders" and she was several feet away from him, out of range for him to cause her any harm at all, but she sprayed him despite his telling her he would have an allergic reaction to the spray.

As a result of the incident, Plaintiff contends he suffered injuries to his eyes and right ear as well as bad headaches because he did not receive proper medical care afterwards. He again asserts the use of the chemical agent was outside of protocol and "not even required or needed or used within guidelines."

B. Warden Page

Plaintiff states Warden Page has neglected his role and does not allow his leadership role as warden "to be seen or felt." He contends Warden Page allowed Lt. Jefferson to repeatedly use excessive force when it was not required or needed and put her in a leadership or supervisory position where she overstepped boundaries and used unlawful force against individuals for personal gain or for reasons of dislike. Plaintiff argues Warden Page knew or should have known of the substantial risk Lt. Jefferson caused him, but instead the warden "sits in his office and allows the officers on the wing to run everything the way they choose;" he explains Warden Page is approaching retirement and has the mindset of allowing officers to do as they please.

Plaintiff also maintains Warden Page allowed Lt. Jefferson, whom he describes as "incompetent and not properly qualified," to carry and use the chemical agent. He states Warden Page "has okayed and permitted her many wrong actions" and claims Warden Page knew Lt. Jefferson was not competent. (Docket no. 1, p. 10).

Plaintiff states while he was on suicide watch, there should have been no interaction between himself and other prisoners, but an unescorted Bowie County inmate was allowed to enter his cell

with a claw hammer and a long screwdriver. Plaintiff says he was "out of his mind" and thought the other inmate was about to kill him. Plaintiff also complains while on suicide watch, he was not allowed to have any items in his cell except for a gown, but he was given a trash bag. He asserts Warden Page "is negligent for unlawful use of excessive force and failing to protect and defend me and for failing to properly train staff while being the warden, while also allowing me to be in an unsafe suicidal environment." (Docket no. 1, pp. 11-12).

### C. Captain Walker

Plaintiff states he spoke to Captain Walker three times over a two year period about Lt. Jefferson's dislike for him and how she treated him differently, but Lt. Jefferson's actions did not changed. Plaintiff filed a grievance and Captain Walker reassured him he would be treated fairly and equally like other inmates. As a result, Plaintiff states he did not continue the grievance process.

Despite this promise, Plaintiff states Lt. Jefferson unlawfully used excessive force on him on July 8, 2017, by spraying him with the chemical agent, leaving him with injuries to his vision and right ear and his hearing after not being able to receive medical treatment due to Lt. Jefferson's conspiracy with the nurses. He contends Captain Walker had knowledge he was being mistreated but failed to protect him.

### D. Nurses Willis and Storey

Plaintiff complains Lt. Jefferson told Nurse Willis and Nurse Storey since Plaintiff did not know how to treat women, they should not treat him. He claims both nurses refused him medical attention after being sprayed with chemical agents. He states he was not allowed to use the eyewash station in the medical department even after asking to use it; instead, the nurses told him he could use the water in his cell. Plaintiff advised them the water in his cell did not work and he did not have access to running water, but they did not take his word.

Plaintiff states he was sprayed in his right ear, and he asked the nurses to flush his ear, but the nurses allowed Lt. Jefferson to make the medical decisions. She told them flushing his ear was not necessary. Plaintiff states because he did not have water in his cell, the chemical agent remained

on his skin and in his eyes and burned for days. His right ear still has pain because the chemical agent mixed with the ear wax. His eyes were blurry and cloudy for weeks, he has black spots in his vision, and showering reactivates the chemical agent embedded in his ear. He claims he has earaches and a ringing in his ears as well as severe headaches starting on the right side of his head by his right ear.

According to Plaintiff, the medical department will not acknowledge his requests seeking treatment. On August 4, 2017, a nurse did see him and referred him to the doctor; however, Plaintiff complains ninety days later, he had not yet been seen. The only treatment he states he received was the checking of his oxygen level by the nurses.

### E. Nurse Arnold

Plaintiff states on July 10, 2017, Nurse Arnold told him she and her department were a team and a decision one person made, they all made. In doing so, Plaintiff contends she began to conspire with Nurse Willis, Nurse Storey, and Lt. Jefferson by not providing him needed medical attention. He asserts Nurse Arnold made false statements and falsified documents to cover up and justify his not being treated or decontaminated or having his eyes and ears flushed. Afterwards, Plaintiff complains Nurse Arnold was allowed to answer every step of the grievance process and to respond to grievances against her. He states she even responded to grievances which were security and not medical issues. Plaintiff identifies Nurse Arnold as the health services administrator and states she has nothing to do with issues outside of medical.

### F. Plaintiff's Grievances

Plaintiff attached a number of grievances to his complaint, which are properly viewed as part of the pleading. Fed. R. Civ. P. 10(c). Grievance no. BOW17-00146 concerned the alleged confiscation of some of his commissary items while he was on suicide watch. (Docket no. 1-1, pp. 2-4). Grievance no. BOW17-00147 concerned the incident in which another inmate entered his cell with a hammer and a screwdriver. In the grievance, Plaintiff states he was in danger and this was done by the maintenance officer, Schofield. The Step One response stated the inmate entered his cell

to perform a duty and Plaintiff was not in danger. On appeal, the warden stated there was no evidence Plaintiff was in danger and the only purpose was to repair the water flow in his cell. On further appeal, the Deputy Director of the Arkansas Department of Corrections concurred with the warden's decision, but instructed the unit warden to monitor the complaint. (Docket no. 1-1, pp. 5-7).

Grievance no. BOW17-00145 complained while Plaintiff was on suicide watch, and unknown officer gave him a trash bag. Plaintiff contends this was a deadly weapon with which he could have hung himself or smothered himself or swallowed it and choked on it. He also stated a nurse gave him a thirty day supply of pills. The response stated when an inmate is placed on suicide watch, he is only allowed certain items.

At the Step Two appeal, Nurse Arnold from the Health Services Department stated Plaintiff had been classified as low risk because he denied suicidal thoughts or plans and stated he wished to be placed on suicide watch because he was angry with a guard and wanted her to do more work. He denied intent to self harm and no depression or sadness was noted. He ate and slept well, denied paranoia, and declined psychiatric treatment because the warden stated his suicide request had been retaliation for catching a disciplinary case because he had tested positive on a drug test. He was removed from suicide watch by the MHMR doctor and told to refrain from activity which could result in discipline.

Plaintiff appealed to the Deputy Director of the Arkansas Department of Corrections and the response acknowledged the Step Two grievance was mistakenly answered by the Health Services Department, but nonetheless concurred with the answer. The Deputy Director also instructed the Warden to follow up on the complaint to ensure proper actions are being taken. (Docket no. 1-1, pp. 8-10).

In grievance no. BOW17-00155, Plaintiff states he broke the rule against insolence to staff, which should have resulted in the proper paperwork being processed, but instead Lt. Jefferson used excessive force when force was not required or permitted. He received a burst of chemical agents

not once but twice directly in his eyes and in his right ear.  Since then, his vision has been blurry and cloudy and he lost some hearing in his right ear.  He asked for medical care but the medical staff said there was nothing they could do.  He asked to use the eye wash station but the medical staff said he had water in his cell.  Plaintiff states the use of force was unnecessary and absurd and he was denied all medical care.  The response to this grievance, signed by Nurse Arnold, stated he was decontaminated per security and assessed by Nurse Strong and Nurse Willis following the incident.

The response to Plaintiff's Step Two appeal was again signed by Nurse Arnold and stated a visual assessment was done prior to decontamination and then an assessment was completed following decontamination per policy.  Plaintiff was seen on August 3, 2017, on a sick call request and no abnormalities were seen at that time.

In his appeal to the Deputy Director, Plaintiff complained he was hit with two bursts of chemical agent and he was only given a visual assessment.  He stated his eyes have been blurry and there are still chemical agents in his ear a month later.  The response to this grievance stated there was no documentation that a pre-lockup assessment was completed by the medical department.  According to policy, a pre-lockup assessment is to be completed when a prisoner is removed from the general population area.  Due to lack of documentation as to whether or not Plaintiff was seen by medical, the Deputy Director determined the grievance had merit.  (Docket no. 1-1, pp. 11-13).

Grievance no. BOW17-00159 complained Plaintiff was unable to get an appointment to see the psychiatrist.  The Deputy Director's response at the third step of the grievance process stated Plaintiff saw the psychiatrist on July 3, 2017 and denied any mental issues, and he was seen on August 14 and referred to the mental health provider again, thus he had received adequate care and the grievance was without merit.  (Docket no. 1-1, p. 14-16).

Grievance no. BOW17-00165 also complained about being unable to see a psychiatrist.  The Step Two response stated he was referred to the mental health department on August 7 and was seen on August 14.  In the Step Three appeal, Plaintiff complained Nurse Arnold was denying him access to mental health care because "I didn't have any issues when she felt I should have them and when

I later requested mental health services she denied me because of a prior visit of not having issues."
The Step Three appeal stated the grievance should have been rejected at the unit level as untimely and therefore had no merit. (Docket no. 1-1, pp. 17-19).

Grievance no. BOW17-00174 complained Plaintiff wrote a grievance against Nurse Arnold and she answered it which she is not permitted to do. The response to the Step One grievance stated Nurse Arnold is the medical designee and has the authority to answer medical grievances, and the Step Two response stated the designee can answer grievances as long as there is no retaliation or failure to act. Additionally, Plaintiff has an appeal process to the Arkansas Department of Corrections for medical grievances. The Step Three response determined the grievance had no merit. (Docket no. 1-1, pp. 20-22).

## II. The Motion for Summary Judgment

The Defendants have filed a motion for summary judgment arguing: Jefferson was legally authorized to use the chemical agents against Plaintiff; Plaintiff's injuries were *de minimis*; Plaintiff received prompt decontamination and medical care; and there was no personal involvement by Warden Page or Captain Walker and no *respondeat superior* liability.

An affidavit from Lt. Jefferson, attached as summary judgment evidence, states on July 8, 2017, Plaintiff was escorted from his cell by Officer Smith for an administrative hearing on a disciplinary infraction for being under the influence of drugs and failing a drug test. She, Lt. Jefferson, was the hearing officer. She states she ruled against Plaintiff, who was very upset and belligerent and was yelling profanities. After being escorted back to his cell, Plaintiff continued yelling and told Officer Smith he wanted to be put on suicide watch. Lt. Jefferson states she came to the cell and Plaintiff was escorted to the medical department. She states he continued to refuse orders, resisted the officers, threatened them, and yelled profanities.

At the infirmary, Lt. Jefferson states Nurse Willis evaluated Plaintiff and put him on suicide watch protocol. The nurse also authorized the use of chemical agents. Officers removed Plaintiff from the medical department, although he continued to yell and to resist in a belligerent manner.

Personal property was removed from his cell and Lt. Jefferson states she warned Plaintiff if he did not follow the rules, chemical agents would be used.

Lt. Jefferson states Plaintiff was placed in his cell and ordered to face the wall. Officers began removing his clothing in conformity with suicide watch protocol. Lt. Jefferson states she ordered Plaintiff to face the wall but he turned away. She warned him chemical agents would be used. After Plaintiff turned away from the wall, Lt. Jefferson states she administered a one second burst of chemical agents, and the officers left Plaintiff's cell and locked it. Plaintiff immediately decontaminated in the shower in his cell.

Lt. Jefferson states Nurse Willis tried to evaluate him through the cell window and other officers, including Lt. Jefferson, told him to return to the shower, but he would not. He was placed in hand restraints and taken to the medical department, where he refused to sit in a chair and had to be forced to sit.

At that point, Lt. Jefferson states Nurses Willis and Storey evaluated Plaintiff, including a blood oxygen reading of 99 percent. Plaintiff was medically cleared and taken to a holding cell while his assigned cell was being decontaminated. Plaintiff, who was still acting belligerent and yelling, was placed on a bench and Lt. Jefferson ordered him to remain seated. Despite being warned chemical agents would be used, Plaintiff stood up before the other officers had left the cell. Lt. Jefferson states she administered a two second burst of chemical agents.

Lt. Jefferson states some officers entered the cell with a nurse to evaluate Plaintiff. They physically took him to the infirmary for an examination. His blood oxygen reading was 98 percent and he was cleared. He was taken back to the temporary holding cell where he remained for a few minutes before being returned to his assigned cell, which has running water.

According to Lt. Jefferson's affidavit, the use of the chemical agent had been pre-authorized by a nurse and Plaintiff had been warned chemical agents would be used. Nonetheless, Lt. Jefferson states Plaintiff refused direct orders to face the wall and to remain seated.

Lt. Jefferson acknowledges she was reprimanded over the incident, explaining her supervisor concluded the use of the chemical agent was not absolutely necessary. She states Plaintiff was provided immediate access to running water after being exposed to the chemical agents and he was evaluated by nurses, who found his blood oxygen level to be acceptable. Lt. Jefferson states neither Warden Page nor Captain Walker were directly or indirectly involved in the use of the chemical agents or the treatment given. (Docket no. 37-1, pp.

The use of force report (docket no. 37-2, p. 1) contains a written statement by Lt. Jefferson essentially tracking what she said in her affidavit. The report also contains a synopsis of the incident (docket no. 37-2, pp. 3-4) and a summary of the final report (docket no. 37-2, p. 7), which concluded chemical agents were not necessary in either of the incidents, Lt. Jefferson allowed untrained staff to document and narrate the video footage, Officer Billy Hall utilized poor camera operation, and staff could be heard whispering unnecessarily. Witness statement forms were attached from Lt. Jefferson and Officers Riley Jernigan, Ronald Marshall, Nicholas Christopher, Clarence Smith, Billy Hall, Ashley Schofield, Heather Black, and Ryne Stubbs. Plaintiff and an inmate named Paul Shew declined to submit witness forms. (Docket no. 37-2, pp. 14-37).

The use of force report also contains an account of the nurse's examination of Plaintiff (docket no. 37-2, p. 46). According to this record, Nurse Storey assessed Plaintiff and determined he was not injured and did not complain of injury. Nurse Storey's affidavit (docket no. 37-3, p. 2) states Plaintiff was assessed twice and was found to have shortness of breath, choking, and burning in the eyes, the effects normally suffered by a person exposed to a chemical agent. She states Plaintiff never showed any symptoms of an allergic reaction.

Plaintiff received disciplinary cases on July 8, 2017 for destruction of property (kicking and breaking a fan), failure to obey the order to stand facing the wall, and threatening to inflict harm on Officer Jernigan. (Docket no. 37-2, pp. 58-60).

### III. The Videotape

The videotape opens with Plaintiff being taken down a hallway and into the medical department. One of the officers says Plaintiff is suicidal, to which Plaintiff responds he is not suicidal, he is on suicide watch. The guard says it is the same thing.

Plaintiff is visibly angry and tells the guards not to touch him. Lt. Jefferson tells him to pay attention and he curses at her and makes threatening remarks toward her. He then curses at the other guards around him. They take him out of the medical department and he tells Lt. Jefferson she is lucky he is in handcuffs or he would beat her. Plaintiff also states every time he comes on, she is going to have paperwork to do.

The guards take him to his cell and Lt. Jefferson tells them to put him against the wall so they can clear his cell. Plaintiff continues to curse and threaten her. She tells him to comply or he will be sprayed, and he says he is allergic to the spray. He accuses Jefferson of falsifying documents and he is going to show her how he writes.

Lt. Jefferson announces Plaintiff will be put in his cell and the medical department has cleared him for suicide watch and to be sprayed with chemical agents. She says if he does not abide by orders he will be sprayed. Plaintiff responds he is going in the cell, he knows better.

Lt. Jefferson orders the guards to remove Plaintiff's pants and shoes. Plaintiff yells Officer Jernigan better not touch him and he will not be touched by Officer Jernigan or Lt. Jefferson. He curses these two officers and says if any of his property is missing, he will say Lt. Jefferson did it on purpose. Lt. Jefferson orders him to face the wall and he replies he orders her to [perform a sexual act on him].

The guards undress Plaintiff and he turns his head around several times. He turns most of his body around to face Lt. Jefferson and she says she did not tell him to turn around. She then sprays a quick burst of pepper spray in his face. She then announces for the camera Plaintiff had been told to face the wall several times and had refused.

Plaintiff coughs repeatedly and says he told her he was allergic. He moves into the corner of the cell, but the guards pull him out. After they secure him in the cell, the camera blurs out for several seconds. After the picture returns, Plaintiff's handcuffs are removed through a slot in the door. The guards say they lost Plaintiff's watch in the cell and demand Plaintiff turn it over. Lt. Jefferson says if he does not, he will be sprayed again. Plaintiff says he cannot find the watch with his eyes closed, and Lt. Jefferson tells him to lay down on his stomach. Eventually he finds the watch and gives it to the guards.

A nurse arrives at the scene and Lt. Jefferson tells her to assess Plaintiff through the window in his cell for now, until she can get him handcuffed and dressed. Plaintiff asks for decontamination and Lt. Jefferson tells him to use the water in his cell. The nurse says she cannot assess Jefferson through the window. She calls out to Plaintiff and he does not respond, but then says he cannot see or hear. The nurse tells him to use water but he replies he did but has nothing to wipe his eyes with. She tells him to run water in his eyes and let the water run over his body. Plaintiff goes to the back of the cell and sits down, and then says he is OK.

Lt. Jefferson tells Plaintiff to back up to the food slot and he does. He is handcuffed and stands up, and Lt. Jefferson tells him to kneel down and face the wall. He kneels down by the door, and at this point the first video ends.

The second video resumes with Plaintiff kneeling by the door. He says he is going to get up and Lt. Jefferson states he will be sprayed if he does. Officers Marshall and Smith open the cell door and dress Plaintiff, while Lt. Jefferson states he is being put in a suicide suit. Plaintiff tells Lt. Jefferson he is going to make her job hard from now on. The guards take Plaintiff out of the cell and down the hall. Plaintiff says he is going to stop walking so they can carry him. The guards push him along and Lt. Jefferson says if he stops walking he will get sprayed. Plaintiff is cursing and says his eyes are closed and he cannot see.

Once they go into the medical department, Plaintiff tells the guards he will not sit down and they seat him in a chair. The nurse tells him he has to cooperate and Plaintiff says he will, there is

only one "whore" in the room he does not like. The nurse puts an oxygen sensor on Plaintiff's finger and says his oxygen reading is 99 percent and his heart rate is 79. She asks if he can breathe, and he says he just got sprayed, so what does she think. The nurse states his oxygen level is fine and he should just calm down.

Plaintiff asks for something for his eyes and the nurse tells him to decontaminate with water. She says he should run water in his eyes and not wipe them because that will make it worse.

Lt. Jefferson announces the medical department has cleared Plaintiff to return to his cell, so he will be put in a holding cell while his cell is decontaminated. The guards take Plaintiff out of the medical department and to the holding cell. As they put him in the cell, Plaintiff states he should have made Lt. Jefferson spray him again. Lt. Jefferson tells the guards to sit Plaintiff down and Plaintiff replies, cursing, he is not going to do a thing and she cannot make him. The guards sit Plaintiff down on a bench at the back of the cell and Lt. Jefferson tells him to stay seated or he will be sprayed, to which Plaintiff replies "as if I give a f****."

As the guards are exiting the cell, Plaintiff stands up off the bench and moves to follow. Lt. Jefferson sprays him again. Plaintiff says he thought they had already gone. Lt. Jefferson announces for the camera that Plaintiff had been sprayed again for refusing to stay seated until all of the officers had left the cell.

Plaintiff moves around the cell and lays down on the floor. He then moves to an area in the cell behind a small wall, possibly by the toilet, but his head is still visible on the video. Lt. Jefferson announces the medical staff is on the way.

Guards enter the cell and pick Plaintiff up off the floor. A nurse appears to be present as well. Plaintiff is taken back to the medical department, where he falls down on the floor. Once put in a chair, Plaintiff says he deserved the first spray but not the second one. The nurse comes to put an oxygen sensor on his finger and tells Plaintiff he needs to calm down, to which Plaintiff replies she needs to stop spraying me. He says he cannot breathe and the nurse says he needs to get water in his cell. Plaintiff states he needs water now. The nurse says Plaintiff's oxygen level is 98 percent

and Lt. Jefferson asks if he has been cleared again. Plaintiff says he is going to make them spray him again and they might as well spray him right there. He says he will be back to the medical department in 10 to 15 minutes.

Plaintiff is taken down the hall and put back into a cell. Lt. Jefferson tells him to stay on the bench and Plaintiff tells her to get her sprayer, but he stays on the bench until the guards leave and close the cell door. He then gets up and walks around inside the cell for about four minutes. Lt. Jefferson tells him to sit down and some guards come into the cell. Lt. Jefferson announces Plaintiff is going back to his own cell after decontamination.

During the escort down the hall, Plaintiff calls out to another inmate that he "made the bitch spray me twice" and he was "thinking about going for round three." He again says he made her spray him twice and he was "fixing to make her spray him again." He is put back into his cell and the handcuffs are removed, and the video ends at that point.

The Fifth Circuit has stated "we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." Carnaby v. City of Houston, 636 F.3d 183, 187 (5th Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 381, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (a court of appeals need not rely on the plaintiff's description of the facts where the record discredits such description but should instead consider "the facts in the light depicted by the videotape.")). The Court has set out the facts evident from the videotape and has considered these facts as evident from the scene in reviewing Plaintiff's claims.

## IV. Legal Standards and Analysis - Lt. Jefferson and the Uses of Force

### A. General Standards for Summary Judgment

On motions for summary judgment, the Court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party; after such examination, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Securities and Exchange Commission v.

13

Recile, 10 F.3d 1093, 1097 (5th Cir. 1994); General Electric Capital Corp. v. Southeastern Health Care, Inc., 950 F.2d 944, 948 (5th Cir. 1992); Rule 56(c), Fed. R. Civ. P. The plaintiff cannot oppose summary judgment by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated or speculative assertions, or by only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant. Id.

The courts have no obligation to sift the record in search of evidence to support a party's opposition to summary judgment. Adams v. Traveler's Indemnity Co., 465 F.3d 156, 164 (5th Cir. 2008). Instead, a party opposing summary judgment must identify specific evidence in the record which supports the challenged claims and articulate the precise manner in which the evidence supports the challenged claim. Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). Thus, a properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show a genuine factual issue exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Plaintiff did not file a response to the motion for summary judgment; accordingly, the district court may accept as undisputed the facts listed in support of the defendants' motion. Eversley v. Mbank Dallas, 843 F.2d 172, 174 (5th Cir. 1988); United States v. Dallas Area Rapid Transit, 96 F.3d 1445, 1996 U.S. App. LEXIS 25217, 1996 WL 512288 (5th Cir. August 30, 1996).

B. The Use of Force Claim

The core judicial inquiry in a prisoner's excessive force claim under the Eighth Amendment is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm. Hudson v. McMillian, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The term "maliciously" means to intentionally do a wrongful act without just cause or excuse, with an intent to inflict injury, or under circumstances which show an evil intent. The term "sadistically" means to inflict pain for one's own pleasure.

Douglas v. Owens, 50 F.3d 1226, 1232-33 and n.13 (3rd Cir. 1995); Parkus v. Delo, 135 F.3d 1232, 1234 (8th Cir. 1998).[1]

Five factors are frequently used in making this determination, including (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. Baldwin v. Stalder, 137 F.3d 836, 839 (5th Cir. 1998). Not every malevolent touch by a prison guard gives rise to a federal cause of action. Hudson, 503 U.S. at 9, *citing* Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied sub nom*. John v. Johnson, 414 U.S. 1033 (1973) (not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights). The Court will proceed to analyze the core judicial inquiry and each of these five factors.

1. The Extent of the Injury Suffered

The Fifth Circuit has explained in order to be actionable, the amount of force used must be more than *de minimis*, provided the use of force is not of a sort repugnant to the conscience of mankind. The plaintiff need not show serious injury, although the extent of the injury may supply insight as to the amount of force applied. Cowart v. Erwin, 837 F.3d 444, 452-53 (5th Cir. 2016); Wilkins v. Gaddy, 559 U.S. 34, 37-38, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010). Where objective factors, including an inmate's medical records, show no evidence of any injuries consistent with the inmate's allegations, the Court may conclude the allegations are implausible. Wilburn v. Shane, 193 F.3d 317, 1999 U.S. App. LEXIS 38885, 1999 WL 706141 (5th Cir., August 20, 1999), *citing* Wesson v. Oglesby, 910 F.2d 278, 281-82 (5th Cir. 1990).

Courts have held the normal effects of being sprayed with pepper spray are *de minimis*. *See, e.g.*, Martinez v. Nueces County, Texas, civil action no. 2:13cv178, 2015 WL 65200 (S.D.Tex., January 5, 2005) (simply being pepper sprayed, without some long term effects, is a *de minimis*

---

[1] These definitions are also used in the Fifth Circuit's Pattern Jury Instructions - Civil Cases, 2014 ed., sec. 10.7 (pp. 104-05).

injury), *aff'd sub nom.* Martinez v. Day, 639 F.App'x 278 (5th Cir., May 12, 2016) (defendants entitled to summary judgment on plaintiffs' claims of excessive force, including tasing and pepper spray, where there was no evidence of cognizable injuries); Williams v. U.S., civil action no. 4:08cv2350, 2009 WL 3459873 (S.D.Tex., August 12, 2011) (claim of "severe bruising and scrapes upon his body" and "extreme pain from being kicked and sprayed in the eyes with pepper spray" were *de minimis*); Oakley v. Weaver, 162 F.3d 1159, 1998 WL 792669 (5th Cir., November 2, 1998) (use of pepper spray during an arrest was not excessive force).

In the present case, the videotape shows after Plaintiff was sprayed the first time, he coughed and had apparent difficulty seeing for a short time. His blood oxygen level was read at 99 percent. After he was sprayed the second time, he laid on the floor in the cell and was then taken to the infirmary, where his blood oxygen level was read at 98 percent, indicating he was able to breathe and get oxygen. He did not display any unusual symptoms or signs of an allergic reaction to the spray; on the contrary, after being sprayed the second time, Plaintiff was defiant, challenging Lt. Jefferson to spray him again while they were still in the infirmary and telling another inmate during the escort to his cell that he had "made the bitch spray me twice," he was thinking about going for round three, and he was "fixing to make her spray him again." The evidence from the videotape indicates Plaintiff did not suffer anything more than a *de minimis* injury.

In his pleadings, Plaintiff asserts he suffered lasting injuries to his eyes and ears, but other than these statements, he offers no evidence or medical records to support these claims. An inmate's bare assertion of a serious medical condition is insufficient without medical evidence verifying the condition exists. Aswegan v. Henry, 49 F.3d 461, 465 (8th Cir. 1995); *accord*, Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994) (prisoner's self-diagnosis alone will not support a medical conclusion); McClure v. Foster, civil action no. 5:10cv78, 2011 U.S. Dist. LEXIS 14546, 2011 WL 665819 (E.D. Tex., January 7, 2011, *Report adopted at* 2011 U.S. Dist. LEXIS 15437, 2011 WL 941442 (E.D. Tex., February 16, 2011, *aff'd* 465 F.App'x 373, 2012 U.S. App. LEXIS 6385, 2012 WL 1059408 (5th Cir., March 29, 2012) (citing Aswegan and Kayser).

These holdings comport with the well-established rule that a non-movant cannot satisfy his summary judgment burden with "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007). In Mosley v. White, 464 F.App'x 206, 2010 U.S. App. LEXIS 25398, 2010 WL 8497638 (5th Cir., December 13, 2010), the Fifth Circuit stated as follows:

> In response to White's motion for summary judgment, as previously explained, Mosley provided the district court with his affidavit and those of his co-inmates and his grievance reports. Although we recognize that the affidavits and reports constitute valid summary judgment evidence, Fed. R. Civ. P. 56(c)(4), we have explained that without more, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the non-movant's burden" and defeat a motion for summary judgment. *Douglass v. United Services. Auto Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996).

Similarly, while Plaintiff's sworn pleadings are competent summary judgment evidence, he presents nothing more than conclusory allegations, speculation, and unsubstantiated assertions concerning his alleged injuries. This is not sufficient to defeat the Defendants' motion for summary judgment. *See also* Foxworth v. Khoshdel, civil action no. 4:07cv3944, 2009 U.S. Dist. LEXIS 89581, 2009 WL 3255270 (S.D.Tex., September 28, 2009) (conclusory allegations of "painful physical injuries to the gums and mouth" were not supported by objective findings in the medical records and thus could not overcome a motion for summary judgment). Based on the objective evidence of the videotape, the first Hudson factor appears to weigh against Plaintiff; however, this factor is not determinative.

## 2. The Need for the Application of Force

The videotape clearly reflects Plaintiff's defiant and belligerent behavior. Prior to being sprayed the first time, he cursed at Lt. Jefferson, threatened her, and told her if he was not in handcuffs he would beat her. He also demanded the other guards not touch him. Lt. Jefferson ordered Plaintiff to face the wall and he responded by demanding a crude sexual act. Once facing the wall, Plaintiff defied orders by repeatedly turning around despite being warned not to do so. When he turned almost all the way around, the first spraying occurred.

In Thomas v. Comstock, 2222 F.App'x 439, 2007 U.S. App. LEXIS 6159, 2007 WL 807037 (5th Cir., March 16, 2007), the plaintiff Lorenzo Thomas was ordered to move to a new housing assignment but refused to do so. He was then ordered to submit to hand restraints and again refused. He was then sprayed with pepper spray. The Fifth Circuit indicated this use of force was *de minimis* and not repugnant to the conscience of mankind because the administration of the pepper spray to an inmate disobeying lawful orders was not objectively unreasonable in light of clearly established law, *citing* Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996) and Soto v. Dickey, 744 F.2d 1260, 1270-71 97th Cir. 1984).

Similarly, in Kitt v. Bailey, civil action no. 4:14cv368, 2015 U.S. Dist. LEXIS 81783, 2015 WL 3909116 (S.D.Tex., June 24, 2015), *aff'd* 676 F.App'x 350, 2017 U.S. App. LEXIS 2595, 2017 WL 620093 (5th Cir., February 14, 2017), the plaintiff Leonard Kitt, who was inside of a small shower stall, was ordered to submit to hand restraints. When he refused, he received a five-second burst of pepper spray despite his claim he made no threatening moves, gestures, or statements. The district court granted the Defendants' motion for summary judgment, holding the use of force was not excessive because the use of a chemical agent to gain compliance is an appropriate response when an inmate refuses to obey repeated orders; prisoners cannot decide what orders they want to obey; there was no evidence showing the use of force was excessive to the need; disobeying orders poses a threat to the order and security of the prison as an institution; Kitt was warned of the consequences of refusing to obey; and, the use of the chemical spray was brief in duration. In affirming the grant of summary judgment for the Defendants, the Fifth Circuit stated "no clearly established law forbids the application of a single burst of a chemical irritant in order to compel a prisoner to comply with an order."

In the present case, the video evidence shows Plaintiff was belligerent and threatening, and then refused to comply with repeated orders to face the wall and remain there. When he turned almost all the way around, after having been warned of the possibility of being sprayed, Sgt. Jefferson sprayed him with a single burst of chemical agents.

In the second spraying, the videotape shows Plaintiff was escorted back to a holding cell from the medical department. He stated he should have made Lt. Jefferson spray him again. When Lt. Jefferson told the guards to sit Plaintiff on a bench in the back of the cell, Plaintiff cursed and stated he was not going to do a thing and she could not make him. After the guards sat Plaintiff on the bench, Lt. Jefferson ordered him to stay seated or he would be sprayed again, and Plaintiff responded "as if I give a f****." The guards then began to exit the cell, but Plaintiff, defying Lt. Jefferson's orders to remain seated, stands up and begins to follow the guards toward the door of the cell. At that point, Lt. Jefferson sprays him again.

The summary judgment evidence thus shows Plaintiff, having expressed his intent to refuse to comply with orders, follows through by standing up and walking toward the door after having been told to remain seated or he would be sprayed. In both of the incidents, Plaintiff's belligerence and refusal to comply with orders created the need for the application of force. The second <u>Hudson</u> factor weighs in favor of the Defendants.

## 3. The Relationship Between the Need and the Amount of Force Used

The videotape shows in both incidents, Plaintiff's refusal to comply with orders was met with a short burst of pepper spray. Each of the sprays was considerably shorter than the five-second spray held not excessive in <u>Kitt</u>. Plaintiff does not show, and the videotape does not indicate, that the relatively minor amount of force used was excessive to the need for the application of force which Plaintiff had created. The third <u>Hudson</u> factor weighs in favor of the Defendants.

## 4. The Threat Reasonably Perceived by Prison Officials

In <u>Sneed v. Lira</u>, civil action no. 09-cv-2583, 2011 U.S. Dist. LEXIS 151230, 2011 WL 6998202 (S.D.Cal., November 3, 2011), the prisoner alleged the guard attacked him without provocation during an escort back to his cell, but the defendants furnished summary judgment evidence showing the prisoner was yelling obscenities, refused direct orders, and lunged at the officers. Although the prisoner claimed he was struck repeatedly, leading to significant injury, the only injury found was some swelling below his left eye. The district court concluded the <u>Hudson</u>

factors regarding the need for the application of force and the threat reasonably perceived by the responsible officials weighed heavily in favor of the guards and granted the defendants' motion for summary judgment.

The videotape in the present case shows Plaintiff cursing, threatening the officers, expressing his intent to disobey orders, and then refusing to comply with repeated direct orders to face the wall or to remain seated. Such behavior cannot be tolerated in a facility of incarceration. Soto, 744 F.2d at 1270 (stating where an inmate cannot be persuaded to obey an order, some means must be used to compel compliance because discipline is essential for the institution to function); Minix v. Blevins, civil action no. 6:06cv306, 2007 U.S. Dist. LEXIS 30058, 2007 WL 1217883 (E.D.Tex., April 23, 2007) (inmates cannot pick and choose which rules to obey), *citing* Meadows v. Gibson, 855 F.Supp. 223, 225 (W.D.Tenn. 1994); Buentello v. Rayford, civil action no. 6:15cv780, 2018 U.S. Dist. LEXIS 127898, 2018 WL 3625858 (E.D.Tex., March 14, 2018), *Report adopted at* 2018 U.S. Dist. LEXIS 127023, 2018 WL 3619244 (E.D.Tex., July 29, 2018) (same). Plaintiff's behavior plainly posed a threat to the orderly operation of the jail. The fourth Hudson factor weighs in favor of the Defendants.

5. Efforts made to temper the severity of a forceful response

The videotape shows Lt. Jefferson's forceful responses consisted of two brief bursts of pepper spray in response to Plaintiff' defiance and refusal to comply with orders. He was promptly taken to the medical department to be seen by a nurse after each incident.

In Martin v. Seal, civil action no. 11-726, 2014 U.S. Dist. LEXIS 86401, 2014 WL 2890125 (E.D.La., June 25, 2014) (decision after remand), the plaintiff Sylvester Martin began acting erratically upon his return from court, yelling that he was suicidal and would kill himself. The defendant Lt. Seal contacted the mental health department, which recommended placing Martin on standard suicide watch against his will. After being placed his cell on suicide watch, Martin began violently shaking the cell bars and jumping on his bed. He was ordered several times to stop but refused.

After being authorized by the medical department to use chemical agents, Lt. Seal again ordered Martin to stop shaking the bars and jumping on his bed. When Martin persisted, Lt. Seal sprayed him with chemical agents. He was brought out of his cell and examined by a nurse, who determined he had no apparent injuries. The parties disputed whether Martin suffered any asthma-related problems as a result of the spraying or if he had any lasting injuries.

The district court initially denied Lt. Seal's motion for summary judgment as to Martin's claims for excessive force and deliberate indifference, and the defendants appealed the denial of qualified immunity under the collateral order doctrine. On appeal, the Fifth Circuit held the district court erred by failing to consider all of the Hudson factors in the excessive force analysis and by relying on the absence of medical records to deny qualified immunity on deliberate indifference. Martin v. Seal, 510 F.App'x 309, 2013 U.S. App. LEXIS 2234, 2013 WL 387876 (5th Cir., January 31, 2013).

On remand, the district court went through each of the Hudson factors and determined that each of those factors weighed in favor of the defendants. With regard to the fifth factor, the district court stated that Lt. Seal had been told by the medical department that Martin's medical condition did not preclude the use of chemical agents and after the spraying, Lt. Seal did not leave Martin to suffer, but had him removed from his cell and medical personnel were summoned to evaluate him. The district court concluded that these efforts to temper the severity of a forceful response weighed in favor of the defendant.

The summary judgment in the present case shows as in Martin, the medical department authorized the use of chemical agents against Plaintiff and he was examined by medical personnel after each spraying. The fifth Hudson factor weighs in the Defendants' favor.

6. The Core Judicial Inquiry

The Supreme Court explained the "core judicial inquiry" is whether the force was used in a good faith effort to restore discipline or maliciously and sadistically for the very purpose of causing harm. Hudson, 503 U.S. at 7. The summary judgment evidence does not show Lt. Jefferson

intentionally acted without just cause or excuse, with an intent to inflict injury, or under circumstances which show an evil intent, nor that she acted to inflict pain for her own pleasure. On the contrary, the summary judgment evidence and the videotape show Lt. Jefferson acted in a good faith effort to restore the discipline breached by Plaintiff's own behavior. *See* Brown v. Vasquez, 699 F.App'x 335, 2017 U.S. App. LEXIS 20720, 2017 WL 4785956 (5th Cir., October 23, 2017) (the fact force was required at all was due to prisoner's repeated failure to comply with orders and his resistance to the extraction team's efforts to restrain him once they entered his cell); Funari v. Warden, 609 F.App'x 255, 2015 U.S. App. LEXIS 12224, 2015 WL 4231669 (5th Cir., July 14, 2015) ("that force was required at all was due to Funari's repeated failure to comply with orders and his continued resistance to the officers once they entered his cell.") Because Plaintiff has failed to show Lt. Jefferson acted maliciously and sadistically for the very purpose of causing harm, rather than in a good faith effort to restore discipline, his Eighth Amendment excessive force claim against her is without merit.

## V. The Other Defendants

A. Warden Page

Plaintiff complains Warden Page has "neglected his role" as warden and does not properly oversee the operation of the jail. To the extent Plaintiff sues Warden Page for his position as warden, the Fifth Circuit has held lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in §1983 cases. Williams v. Luna, 909 F.2d 121, 123 (5th Cir. 1990); *see also* Ashcroft v. Iqbal, 556 U.S. 662, 676 129 S.Ct. 1937, 183 L.Ed.2d 868 (2009) (government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*).

Instead, a supervisor may be held liable if he affirmatively participates in the acts causing a constitutional deprivation or he implements unconstitutional policies which causally result in the constitutional injury. Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011). A supervisor may also be liable for failure to supervise or train if: (1) the supervisor either failed to supervise or train the

subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." Id., *citing* Goodman v. Harris Cnty., 571 F.3d 388, 395 (5th Cir. 2009).

Plaintiff has not shown Warden Page affirmatively participated in acts causing a constitutional deprivation or the warden implemented unconstitutional policies resulting in a constitutional injury. He asserts the warden neglected his duties, though offering no evidence of such neglect; in any event, such an allegation is one of negligence, which does not rise to the level of a constitutional claim. Daniels v. Williams, 474 U.S. 327, 329-30, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

Nor has Plaintiff shown Warden Page failed to train or supervise Lt. Jefferson or that such a failure was deliberate indifference, much less that any such failure was linked to a violation of his rights. Goodman, 571 F.3d at 396 (speculative claims of failure to train or supervise, absent any showing how a particular training program is defective, cannot survive summary judgment).

Furthermore, Plaintiff failed to show a violation of his constitutional rights, an essential element in a claim of supervisory liability or failure to train or supervise. Porter, 659 F.3d at 446; Gibbs v. King, 779 F.2d 1040, 1046 n.6 (5th Cir.), *cert. denied* 476 U.S. 1117 (1986) (absent primary liability, there can be no supervisory liability).

Plaintiff asserts while he was in isolation, another inmate was allowed to come in his cell with a screwdriver and he was given a trash bag despite being on suicide watch. He does not show Warden Page had any personal involvement with either of these incidents; his grievance states this was done by a maintenance officer named Schofield, who is not named as a defendant in the lawsuit. The response to Plaintiff's grievance states the inmate with a screwdriver was working for the maintenance department and was repairing a broken fixture in Plaintiff's cell. Plaintiff has not shown any harm from this incident and fails to show how this amounts to deliberate indifference to his safety by Warden Page.

Plaintiff also complains he was on suicide watch, but was given a trash bag. He has not shown Warden Page had any personal involvement or even any knowledge of Plaintiff's being given a trash bag. *See* Jacquez v. Procunier, 801 F.2d 789, 793 (5th Cir. 1986) (in order to successfully plead a cause of action in civil rights cases, a plaintiff must enunciate a set of facts illustrating the defendants' participation in the alleged wrong). In any event, Plaintiff told the nurses he was in fact not suicidal, and he has not shown any harm from the fact he was given a trash bag. Plaintiff's claims against Warden Page are without merit.

B. Captain Walker

Plaintiff asserts he complained to Captain Walker about Lt. Jefferson several times and Captain Walker assured him he would be treated fairly and equally like other inmates. Despite this promise, Plaintiff complains Lt. Jefferson nonetheless used force on him.

The Fifth Circuit has held inmates do not have a constitutionally protected liberty interest in having grievances or complaints resolved to their satisfaction, and there is no violation of due process when prison officials fail to do so. Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005). The fact Captain Walker did not act on Plaintiff's complaint as Plaintiff believed appropriate is not a constitutional violation.

Nor has Plaintiff set out a viable failure to protect claim against Captain Walker. A prison official may be liable for failing to protect a prisoner from another official if he knew of an excessive risk to health or safety posed by such other officer and disregarded the risk. *See* Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995). The mere fact Plaintiff complained to Captain Walker about Lt., Jefferson does not impute knowledge that Lt. Jefferson posed an excessive risk to Plaintiff's health or safety. *See* Whitlock v. Merchant, civil action no. 5:14cv119, 2016 WL 2996390 (E.D.Tex., May 25, 2016) (defendant did not have a constitutional obligation to believe Plaintiff's allegations and take the actions Plaintiff believed appropriate), *citing* Geiger, 404 F.3d at 373-74; *cf.* Althouse v.; Roe, 542 F.Supp.2d 543, 579 (E.D.Tex. 2008), *appeal dismissed* (prison officials have no

constitutional duty to believe inmates' claims as to their medical conditions as opposed to the findings of medical professionals). Plaintiff's claims against Captain Walker are without merit.

C. Nurses Willis and Storey

Plaintiff complains the nurses refused to treat him after he was sprayed with chemical agents. He also asserted Lt. Jefferson told Nurse Willis and Nurse Storey since Plaintiff did not know how to treat women, they should not treat him, and Lt. Jefferson told the nurses Plaintiff did not need his ear flushed. (No such remarks are audible on the videotape).

The videotape shows the nurses assessed him and found him to be uninjured, other than the normal reactions to pepper spray.[2] Plaintiff's behavior and responses on the videotape do not indicate he suffered any other injuries or any kind of allergic reaction. The nurses read his blood oxygen level, presumably to ensure he could still breathe, and this level was within normal limits after each spraying. The videotape also shows the nurses explained to Plaintiff how to decontaminate with water in his cell.

The Fifth Circuit has held deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). Unsuccessful medical treatment, negligent acts, medical malpractice, or a prisoner's disagreement with his medical treatment are insufficient to establish a constitutional violation. Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006).

---

[2]The effects of pepper spray generally last from 20 to 90 minutes. *See* http://www.peppersprayinformation.com. No special decontamination protocols are required for OC pepper spray because it is biodegradable, and will not persist on clothing or the affected areas. *See* 'Evaluation of Pepper Spray,' National Institute of Justice Research in Brief, February 1997, *cited in* Clay v. Stacks, civil action no. 9:04cv72, 2006 U.S. Dist. LEXIS 14146, 2006 WL 688999 (E.D. Tex., March 15, 2006). The Third Circuit has reversed a district court's determination that use of a pepper spray by a bank robber constitutes "use of a dangerous weapon" because the effects of the spray lasted only 10 to 15 minutes. United States v. Harris, 44 F.3d 1206, 1214 (3rd Cir. 1995). The Fifth Circuit has observed that decontamination from pepper spray "consists primarily of flushing the eyes with water." Wagner v. Bay City, Texas, 227 F.3d 316, 319 n.1 (5th Cir. 2000).

In <u>Domino v. TDCJ-ID</u>, 239 F.3d 752 (5th Cir. 2001), an inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. <u>Johnson v. Treen</u>, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." <u>Id.</u> Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." <u>Estelle v. Gamble</u>, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. <u>Farmer v. Brennan</u>, 511 U.S. 825, 838 (1994).

<u>Domino</u>, 239 F.3d at 756; *see also* <u>Stewart v. Murphy</u>, 174 F.3d 530, 534 (5th Cir. 1999).

The fact Plaintiff disagrees with the treatment he received and believes more treatment would have been appropriate does not show the nurses acted with deliberate indifference to his medical needs. *See also* <u>Patterson v. Dretke</u>, civil action no. 2:04cv132, 2004 U.S. Dist. LEXIS 9946, 2004 WL 1205126 (N.D.Tex., June 2, 2004) (prisoner's belief more tests should be conducted or additional diagnostic measures undertaken does not elevate a claim to constitutional dimensions), *citing* <u>Varnado v. Lynaugh</u>, 920 F.2d 320, 321 (5th Cir. 1991); <u>Nelson v.Griffin</u>, civil action no. 5:16cv49, 2017 WL 2274252 (E.D.Tex., May 25, 2017) (same). This claim is without merit.

Plaintiff also asserts he has had continuing problems with his eyes and ears, and states he sent in medical requests which were not acknowledged. However, he concedes he was seen by a nurse on August 4, 2017, and referred to the doctor, whom he had not seen as of ninety days later. Plaintiff has offered nothing to suggest this delay in seeing the doctor was the result of deliberate indifference on the part of the nursing staff, nor has he shown the delay has resulted in substantial harm. *See* <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 195 (5th Cir. 1993); <u>Wesson v. Oglesby</u>, 910 F.2d 278, 284 (5th Cir. 1990). Plaintiff's claims against Nurses Willis and Storey are without merit.

D. Nurse Arnold

Plaintiff complains Nurse Arnold told him she and her department were a team and a decision one person made, they all made; thus, he asserts she conspired with Nurse Willis, Nurse Storey, and Lt. Jefferson to not provide him with medical care. He also complains Nurse Arnold made false statements and falsified documents, apparently referring to the grievances she answered, and asserts she answered grievances which she should not have.

The Fifth Circuit has stated in order to recover on a claim of a conspiracy, there must be an actual deprivation of a constitutional right; a mere conspiracy to deprive is insufficient. Villanueva v. McInnis, 723 F.2d 414, 418 (5th Cir. 1984). Plaintiff has not shown an actual deprivation of a constitutional right, rendering his claim of conspiracy without merit.

Although Plaintiff also complains of Nurse Arnold's answers to his grievances, this claim lacks merit because Plaintiff does not have a protected liberty interest in the grievance procedure. Geiger, 404 F.3d at 374-75. His claim regarding Nurse Arnold answering a grievance which she allegedly should not have fails for the same reason. Plaintiff has offered nothing to show any of Nurse Arnold's responses to his grievances were falsified, much less that any such falsification amounted to a constitutional violation. *See* United States v. Towns, 718 F.3d 404, 409-10 (5th Cir. 2013); *accord,* Mathis v. Alexander, 49 F.3d 728, 1995 U.S. App. LEXIS 44040, 1995 WL 103646 (5th Cir., March 3, 1995) (noting the plaintiff "alleges that the prison and medical records were falsified and that Dr. Kuykendall gave perjured testimony at the Spears hearing; however, he offers no facts to support these allegations. Therefore, they are lacking in merit.") His claims against Nurse Arnold are without merit.

E. Jail Rules and Regulations

The summary judgment evidence shows a number of officers, including Lt. Jefferson, received disciplinary action arising from this incident. However, the fact jail rules may have been violated is not sufficient to rise to the standards of a constitutional claim. Myers v. Klevenhagen, 97 F.3d 91, 94 (5th Cir. 1996); Hernandez v. Estelle, 788 F.2d 1154, 1158 (5th Cir. 1986). In order

to prevail on a §1983 lawsuit, Plaintiff must show violations of constitutional standards, not merely jail rules or regulations. He did not do so.

F. Qualified Immunity

Qualified immunity protects government officials from liability for monetary damages in their individual capacities insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Thompson v. Mercer, 762 F.3d 433, 436-37 (5th Cir. 2014). Claims of qualified immunity require a two-step analysis, which may be done in either order: first, the court determines whether a constitutional right would have been violated on the facts alleged, and second, whether the right was clearly established at the time of the alleged violation. Kitchen v. Dallas County, 759 F.3d 468, 476 (5th Cir. 2014). Even if the official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable. Jones v. Collins, 132 F.3d 1048, 1052 (5th Cir. 1998).

After the defendants properly invoke qualified immunity, the plaintiff bears the burden to rebut its applicability. Kovacic v. Villareal, 628 F.3d 209, 211 (5th Cir. 2010). Such a rebuttal requires a showing that all reasonable officials, similarly situated, would have known the defendants' acts violated the Constitution. Tamez v. Matheny, 589 F.3d 764, 770 n.2 (5th Cir. 2009); Thompson v. Upshur County, 245 F.3d 447, 460 (5th Cir. 2001). Conclusory allegations are insufficient to overcome the qualified immunity defense. Williams-Boldware v. Denton County, Texas, 741 F.3d 635, 643-44 (5th Cir. 2014).

Plaintiff has failed to meet his burden of overcoming the qualified immunity defense. The summary judgment evidence does not show a constitutional violation occurred or that any of the Defendants acted in an objectively unreasonable manner. The Defendants are entitled to qualified immunity from suit.

## VI. Conclusion

A review of the pleadings and the competent summary judgment evidence shows there are no disputed issues of material fact and the Defendants are entitled to judgment as a matter of law. It is accordingly

**ORDERED** the Defendants' motion for summary judgment (docket no. 37) is **GRANTED** and the above-styled civil action is **DISMISSED WITH PREJUDICE**.  It is further

**ORDERED** any and all motions which may be pending in this civil action are hereby **DENIED**.

**SIGNED this 27th day of February, 2019.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE